**[J-125A-L-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| IN RE:  PETITION OF THE BOROUGH OF DOWNINGTOWN | : | No. 12 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 2342 CD |
| APPEAL OF:  FRIENDS OF KARDON PARK AND ANN FELDMAN | : | 2013 dated April 29, 2015 which |
| | : | affirmed in part and reversed in part the |
| | : | Order of the Chester County Court of |
| | : | Common Pleas, Orphans' Court |
| | : | Division, at No. 1509-0516 dated |
| | : | December 20, 2013. |
| | : | |
| | : | ARGUED:  December 7, 2016 |
| | | |
| IN RE:  PETITION OF THE BOROUGH OF DOWNINGTOWN | : | No. 13 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 26 CD |
| APPEAL OF:  FRIENDS OF KARDON PARK AND ANN FELDMAN | : | 2014 dated April 29, 2015 which |
| | : | affirmed in part and reversed in part the |
| | : | Order of the Chester County Court of |
| | : | Common Pleas, Orphans' Court |
| | : | Division, at No. 1509-0516 dated |
| | : | December 20, 2013. |
| | : | |
| | : | ARGUED:  December 7, 2016 |
| | | |
| IN RE:  PETITION OF THE BOROUGH OF DOWNINGTOWN | : | No. 14 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 75 CD |
| APPEAL OF:  FRIENDS OF KARDON PARK AND ANN FELDMAN | : | 2014 dated April 29, 2015 which |
| | : | affirmed in part and reversed in part the |
| | : | Order of the Chester County Court of |
| | : | Common Pleas, Orphans' Court |
| | : | Division, at No. 1509-0516 dated |
| | : | December 20, 2013. |
| | : | |
| | : | ARGUED:  December 7, 2016 |

| | |
|---|---|
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN | : No. 15 MAP 2016 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 76 CD |
| APPEAL OF: FRIENDS OF KARDON PARK AND ANN FELDMAN | : 2014 dated April 29, 2015 which |
| | : affirmed in part and reversed in part the |
| | : Order of the Chester County Court of |
| | : Common Pleas, Orphans' Court |
| | : Division, at No. 1511-1629 dated |
| | : December 20, 2013. |
| | : |
| | : ARGUED: December 7, 2016 |

| | |
|---|---|
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN | : No. 16 MAP 2016 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 2342 CD |
| APPEAL OF: BOROUGH OF DOWNINGTOWN, COUNCIL OF THE BOROUGH OF DOWNINGTOWN, PROGRESSIVE HOUSING VENTURES, LLC AND J. LOEW & ASSOCIATES, INC. | : 2013 dated April 29, 2015 which |
| | : affirmed in part and reversed in part the |
| | : Order of the Chester County Court of |
| | : Common Pleas, Orphans' Court |
| | : Division, at No. 1509-0516 dated |
| | : December 20, 2013. |
| | : |
| | : ARGUED: December 7, 2016 |

| | |
|---|---|
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN | : No. 17 MAP 2016 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 26 CD |
| APPEAL OF: BOROUGH OF DOWNINGTOWN, COUNCIL OF THE BOROUGH OF DOWNINGTOWN, PROGRESSIVE HOUSING VENTURES, LLC AND J. LOEW & ASSOCIATES, INC. | : 2014 dated April 29, 2015 which |
| | : affirmed in part and reversed in part the |
| | : Order of the Chester County Court of |
| | : Common Pleas, Orphans' Court |
| | : Division, at No. 1509-0516 dated |
| | : December 20, 2013. |
| | : |
| | : ARGUED: December 7, 2016 |

| | |
|---|---|
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN | : No. 18 MAP 2016 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 75 CD |
| APPEAL OF: BOROUGH OF DOWNINGTOWN, COUNCIL OF THE BOROUGH OF DOWNINGTOWN, | : 2014 dated April 29, 2015 which |
| | : affirmed in part and reversed in part the |
| | : Order of the Chester County Court of |

| | |
|---|---|
| PROGRESSIVE HOUSING VENTURES, LLC AND J. LOEW & ASSOCIATES, INC. | Common Pleas, Orphans' Court Division, at No. 1509-0516 dated December 20, 2013. |
| | ARGUED: December 7, 2016 |
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN<br><br>APPEAL OF: BOROUGH OF DOWNINGTOWN, COUNCIL OF THE BOROUGH OF DOWNINGTOWN, PROGRESSIVE HOUSING VENTURES, LLC AND J. LOEW & ASSOCIATES, INC. | No. 19 MAP 2016<br><br>Appeal from the Order of the Commonwealth Court at No. 76 CD 2014 dated April 29, 2015 which affirmed in part and reversed in part the Order of the Chester County Court of Common Pleas, Orphans' Court Division, at No. 1511-1629 dated December 20, 2013.<br><br>ARGUED: December 7, 2016 |
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN<br><br>APPEAL OF: KIM MANUFACTURING COMPANY AND STEWART HALL, L.P. | No. 20 MAP 2016<br><br>Appeal from the Order of the Commonwealth Court at No. 2342 CD 2013 dated April 29, 2015 which affirmed in part and reversed in part the Order of the Chester County Court of Common Pleas, Orphans' Court Division, at No. 1509-0516 dated December 20, 2013.<br><br>ARGUED: December 7, 2016 |
| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN<br><br>APPEAL OF: KIM MANUFACTURING COMPANY AND STEWART HALL, L.P. | No. 21 MAP 2016<br><br>Appeal from the Order of the Commonwealth Court at No. 26 CD 2014 dated April 29, 2015 which affirmed in part and reversed in part the Order of the Chester County Court of Common Pleas, Orphans' Court Division, at No. 1509-0516 dated December 20, 2013.<br><br>ARGUED: December 7, 2016 |

| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN | : | No. 22 MAP 2016 |
|---|---|---|
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 75 CD |
| APPEAL OF: KIM MANUFACTURING COMPANY AND STEWART HALL, L.P. | : | 2014 dated April 29, 2015 which |
| | : | affirmed in part and reversed in part the |
| | : | Order of the Chester County Court of |
| | : | Common Pleas, Orphans' Court |
| | : | Division, at No. 1509-0516 dated |
| | : | December 20, 2013. |
| | : | |
| | : | ARGUED: December 7, 2016 |

| IN RE: PETITION OF THE BOROUGH OF DOWNINGTOWN | : | No. 23 MAP 2016 |
|---|---|---|
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 76 CD |
| APPEAL OF: KIM MANUFACTURING COMPANY AND STEWART HALL, L.P. | : | 2014 dated April 29, 2015 which |
| | : | affirmed in part and reversed in part the |
| | : | Order of the Chester County Court of |
| | : | Common Pleas, Orphans' Court |
| | : | Division, at No. 1511-1629 dated |
| | : | December 20, 2013. |
| | : | |
| | : | ARGUED: December 7, 2016 |

## OPINION

**JUSTICE TODD**                                             **DECIDED: June 20, 2017**

In these consolidated cross-appeals, we accepted review to consider whether three statutory provisions — the "Donated or Dedicated Property Act" ("DDPA"),[1] the "Project 70 Land Acquisition and Borrowing Act" ("Project 70 Act"),[2] and the Eminent Domain Code[3] — allow Appellant Downingtown Borough ("Borough")[4] to sell to private housing developers — Appellants Progressive Housing Ventures, LLC and J. Loew and

---

[1] 53 P.S. §§ 3381-3386.
[2] 72 P.S. §§ 3946.1 *et seq.*
[3] 26 Pa.C.S. §§ 101 *et seq.*
[4] Tracking the manner in which the litigation proceeded in the lower courts, Downingtown Borough has been designated by our Court as the Appellant.

Associates, Inc. ("Developers") — four parcels of land that, collectively, comprise "Kardon Park," a public community park currently owned and maintained by the Borough, and to grant easements over parts of the park. After review, we vacate the order of the Commonwealth Court with respect to the Borough's proposed sale to Developers of the two parcels described herein as the Southern Parcels, reverse the order of the Commonwealth Court regarding the proposed sale by the Borough to Developers of the two parcels described herein as the Northern Parcels, and reverse the order of the Commonwealth Court involving the Borough's grant of easements to Developers over the parcels described herein, and we remand to that tribunal for further proceedings consistent with this opinion.

## I. Background

## A. Factual History

Downingtown Borough, in which Kardon Park is primarily situated, is one of Pennsylvania's oldest communities.[5] Founded as a colonial frontier village in 1716, the Borough has, from its inception, been a hub of industrial activity. An ample number of bustling corn and grist mills operated there during the 1700s, and it served as a vital supply depot for the colonists during the Revolutionary War. Later, during the Industrial Revolution in the 1800s, a number of paper mills and various other manufacturing industries began operating in and around the Borough. Manufacturing remained a cornerstone of the Borough's economy throughout the majority of the 20th century.

Despite this industrial history, the Borough has made a concomitant effort to acquire and reserve land for the establishment of public parks. Thus, in 1925, the Borough created Kerr Park, a municipal park along the eastern banks of Brandywine

---

[5] This history is derived, in part, from descriptions by the local historical society. *See* Downingtown Area Historical Society, *History of Downingtown*, available at http://www.downingtownareahistoricalsociety.org/History.html.

Creek, which was noteworthy in that it was sustained not only by public expenditures, but by a community subscription program in which Borough residents voluntarily paid a monthly fee for maintenance and operation of the park. Kardon Park, at issue herein, was likewise created by the Borough for similar public purposes through a series of land acquisitions in the 1960s and 1970s, explained in more detail *infra*. It lies just east of Kerr Park, and straddles the northern border of the Borough with East Caln Township.[6]

Consistent with this historical legacy of dual-purpose land use within the Borough, some of the land on which Kardon Park is located was formerly used for industrial activities and as a disposal area for byproducts of those activities. In the 1930s, the property which now comprises the western part of the park was extensively quarried for minerals by its owners. Once the minerals were exhausted, the open quarry pits were filled in with industrial waste generated by various industries operating within the Borough, as well as municipal waste. Orphans' Court Opinion, 10/7/10, at 5. The waste dumped into these quarries included iron slag, heavy metals, paper, and wood products. *Id.* at 18. The waste layer that accumulated from the years of dumping, which is intermixed with soil, ranges from 2 to 12 feet in thickness, and occupies an area of approximately 250,000 cubic yards. *Id.*

Beginning in the 1960s, the Borough began acquiring, through various means, the then-privately owned parcels of land which now comprise the majority of the park's total land area. In 1962, the Borough purchased 7.6 acres of wooded property from its owner Kathryn Meisel. This parcel, UPI 11-4-23[7] (the "Meisel Parcel"), which is situated

---

[6]  East Caln Township does not own any of the land comprising Kardon Park, nor does it have any maintenance responsibility for the park, and it is not a party to this litigation.

[7]  UPI stands for "uniform parcel identifier" which is a statutorily established "finite, punctuated sequence of numbers indicating the land parcel or other interest in real estate as shown on the recorded county tax map" which can also function, as it does in the case at bar, as the county tax parcel number. 21 P.S. § 332.

partly in the Borough and partly in East Caln Township, contains two manmade ponds ("Second Lake" and "Third Lake")[8] which were the remnants of the watercourse, known as a "millrace," used in the operation of the very first grist mill complex erected in the Borough in the 1700s.  *Id.* at 3.

In 1964, to address the problem of dwindling land available for public recreation and conservation uses, and in response to the accelerating population growth of urban and suburban areas, the General Assembly passed the Project 70 Act which authorized the Commonwealth to borrow up to $20 million to provide financial assistance to local governments for the acquisition of lands which were either currently being used for recreational, conservation, or historical purposes, or which could be put to such uses in the future.  *See* 72 Pa.C.S. § 3946.2 (Project 70 Act statement of purpose); *id.* § 3946.16(a)(4) (allocation of bond monies).[9]  The Project 70 Act authorizes the General Assembly to furnish to the municipality up to fifty percent of the cost of acquisition of such lands.  *Id.* § 3946.16(a)(4).  In exchange for this subsidy, the Project 70 Act requires that any deed of conveyance of property acquired with such monies

---

[8]  Second Lake presently occupies the Southeastern corner of Kardon Park and is connected via watercourse to Third Lake which lies immediately to its north.

[9]  The Project 70 Act was enacted by the legislature to implement Article 8, § 15 of the Pennsylvania Constitution, entitled "Project '70'," which was adopted by the voters of the Commonwealth in 1963, and which provides:

> In addition to the purposes stated in article eight, section seven of this Constitution, the Commonwealth may be authorized by law to create debt and to issue bonds to the amount of seventy million dollars ($70,000,000) for the acquisition of land for State parks, reservoirs and other conservation and recreation and historical preservation purposes and for participation by the Commonwealth with political subdivisions in the acquisition of land for parks, reservoirs and other conservation and recreation and historical preservation purposes, subject to such conditions and limitations as the General Assembly may prescribe.

Pa. Const. art. VIII, § 15.

contain a restrictive covenant specifying that "[t]his indenture is given to provide land for recreation, conservation and historical purposes, as said purposes are defined in [the Project 70 Act]." *Id.* § 3946.20(c).[10]

The Borough obtained Project 70 Act funds in 1968 and used them to finance fifty percent of the cost of two parcels of land, which it purchased from Downingtown Paper Company: a 14-acre tract in East Caln Township, the northern third of which is occupied by a man-made pond known as "Fourth Lake," UPI 40-1.23.1; and an adjoining 7.4-acre piece of property located in the Borough, bordering the first parcel at its southern edge, UPI 11-4-13. The Borough used its own public funds to cover the other half of the total purchase price of $12,671.20. These two parcels were collectively designated by the lower courts as the "Northern Parcels," and they will be referred to in the same manner herein. The "Deed of Confirmation" conveying these properties to the Borough, necessary for the release of the Project 70 Act grant funds,[11] contained an indenture specifying that it was being used to provide land "for recreation, conservation and historical purposes, as defined in [the Project 70 Act]." Deed of Confirmation, 10/30/68, 3 (R.R. 2410a).

In 1974, the Borough exercised its power of eminent domain, via ordinance, and acquired UPI 11-4-14.2, a 7.4-acre piece of property which adjoins the Meisel Parcel immediately to the west of Second Lake. The declaration of taking provided that the purpose of this condemnation was "to expand and enlarge recreation places and space within the borough limits." Declaration of Taking, 11/13/74 (R.R. at 2417). The ordinance authorizing the condemnation provided that the property was being acquired

---

[10] As discussed *infra*, the Project 70 Act also provides, in pertinent part, that "[n]o lands acquired with funds made available under this act shall be disposed of or used for purposes other than those prescribed [therein] without the express approval of the General Assembly." 72 P.S. § 3946.20(b).

[11] *See* 72 Pa.C.S. § 3946.20.

for "park and recreation purposes." Ordinance, 11/14/74 (R.R. at 2416). In 1977, the Borough again utilized its eminent domain authority, via passage of another ordinance, to obtain title to an adjoining 4.3-acre wooded tract of land immediately to the west of the first condemned parcel, UPI 11-4-14. Just as with the first condemnation, its purpose was "to expand and enlarge recreation places and space within the borough limits," and the authorizing ordinance stated that the land was being taken for "park and recreation purposes." Declaration of Taking, 6/20/77 (R.R. at 2420); Ordinance 6/22/77 (R.R. at 2425). These two parcels were collectively designated by the lower courts, and will be referred to herein, as the "Southern Parcels." It is these five parcels — the Northern Parcels, the Southern Parcels, and the Meisel Parcel — which are the subject of the case before us.

In 1978, the Borough Council, Borough Manager, and the Mayor of Downingtown Borough held a ceremony at which they named and dedicated the Southern Parcels as "Kardon Park," and they erected a sign on Pennsylvania Avenue, which serves as the lower boundary of the Southern Parcels, that read "Kardon Park." Orphans' Court Opinion, 10/7/10, at 8, 14. Thereafter, in 1984, a paved, multi-use trail was constructed in the park by the Borough, which named it the "Lion's Trail." It runs along the western banks of Second and Third Lakes, traversing the entirety of the Southern and Northern Parcels, whereupon it exits the park and joins with the "Struble Trail," which is a part of the national Rails to Trails Network. At the same time, the Borough also constructed a parking lot at the southern end of the park near Pennsylvania Avenue for use by park patrons. Since its opening, Lion's Trail has been used continuously by members of the public for jogging, walking, and biking. In 2004, the Borough allowed the Crime Victims' Center of Chester County, a non-profit crime victim's advocacy organization, to erect a

permanent "Victims of Violence Memorial," which is the site of annual services in honor of those who died from acts of violence. *Id.* at 5-6.

Since 1984, the Borough has continually performed maintenance activities in the park, such as planting and mowing the grass, caring for the trails and the area around the Victims of Violence Memorial, and erecting signage to guide park users. The park has been and continues to be popular with Borough residents and other members of the public who use it for numerous outdoor activities such as picnics, bird watching, and family and social gatherings, and the ponds in the park are used for fishing in the summertime and ice skating in the winter. *Id.* at 5-6, 14-15. Additionally, from 1984 until 2009, the Borough identified Kardon Park on its zoning maps as either a "Park" or "Public Park." *Id.* at 15.

In the early 1990s, the Borough began envisioning a different use for a portion of the land in the park — commercial development. *Id.* at 6. In preparation for selling the property to a developer, in 1999, the Borough sought and obtained a release from the General Assembly of the Project 70 Act restrictions on Northern Parcel UPI 11-4-13, in exchange for the Borough's imposition of Project 70 Act restrictions on another parcel of land owned by the Borough, and on an additional parcel the Borough pledged to obtain. *See* Act of June 25, 1999, P.L. 220, No. 29, §§ 2-4.

That same year, the Borough sought "Act 2" clearance from the Pennsylvania Department of Environmental Protection ("DEP"),[12] and it enlisted an environmental

---

[12] Act 2 is the name by which our Commonwealth's "Land Recycling and Environmental Remediation Standards Act," 35 P.S. §§ 6026.101-6026.908 (Acts 2, 3, and 4 of 1995), is generally referred. This program encourages the cleanup and re-use of polluted property by establishing uniform remediation standards for contaminated soil and groundwater. Once a property owner files a report demonstrating that the property meets the required remediation standards under Act 2, and the DEP accepts and approves the report and any ongoing monitoring plan, the owner and any subsequent owner are exempted from liability for issues arising from the prior contamination. (continued…)

engineering firm, Golder Associates, to perform an assessment of the surface and subsurface soil in the park, as well as the groundwater, to identify any contaminants which were present, and to prepare a plan for their remediation.  Golder's environmental analysis identified various heavy metals and industrial byproducts present in the park soil.  Orphans' Court Opinion, 10/7/10, at 6.  Golder ultimately concluded, though, that "risks due to potential direct contact of both park users and park groundskeepers to contaminants in the surface soil at Kardon Park were within limits established by the Pennsylvania DEP."  *Id.* at 7.  Golder additionally conducted surveys of park users and Borough employees.  *Id.* at 6-7.  This survey revealed that 77 percent of the park's recreational usage was by people utilizing its trails for walking, running, jogging, biking, roller-skating, or skateboarding, and that the average length of use was 10 minutes or less.  *Id.* at 7.  Golder included all of this information in a report submitted to the DEP, formally requesting Act 2 clearance, which the DEP granted in 2000, with the stipulation that the park property to the west of the walking trail and extending to the park's northern border with East Caln Township would be restricted to commercial uses, and the remainder of the property would be limited in use to "non-residential park uses." DEP Order, 1/14/00, 3-4 (R.R. at 2468a).

In July 2006, the Borough formally sought proposals from prospective buyers who were willing to purchase and redevelop the park.  Developers were the successful bidders, and, on August 24, 2007, Developers and the Borough entered into a purchase agreement pursuant to which Developers agreed to buy the Northern Parcels, the Southern Parcels, and the Meisel Parcel for the purpose of constructing a mixed use development, which would include 305 individual residential units, 40 combination

(…continued)
Pennsylvania Department of Environmental Protection, *Land Recycling Program* (2017), available at http://www.dep.pa.gov/Business/Land/LandRecycling/Pages/default.aspx.

residential and commercial rental units, and 20,000 square feet of commercial space. Orphans' Court Opinion, 10/7/10, at 7; Agreement to Purchase and Sell Real Estate, 8/17/07 (R.R. at 2921a); First Amendment to Purchase Agreement, 8/17/07 (R.R. at 1223a).

Additionally, a new environmental engineering firm, Advanced GeoServices, was retained to review the prior environmental risk assessment performed by Golder. In a March 2008 report, Advanced GeoServices found "exposure to collective concentrations of arsenic, iron and mercury encountered on the [park] Property represents an unacceptable risk to park users." Orphans' Court Opinion, 10/7/10, at 8. Advanced GeoServices crafted a comprehensive plan to address the contamination which called for a two-foot layer of topsoil to be spread over the areas in which waste had historically been dumped. The DEP approved this plan in August 2008, agreeing that the proposed soil cap was "an equally conservative and appropriate option to eliminate exposure pathways and maintain the stability of the historic fill." DEP Letter, 8/6/08 (R.R. at 2475a). Subsequently, in March 2009, the Commonwealth Department of Community and Economic Development approved a grant of $990,000 to defray the cost of this proposed remediation.

In January 2009, the Borough amended its municipal code to create the "Kardon Park Redevelopment District," which authorized the planned development in the area occupied by Kardon Park. Subsequently, the purchase agreement between the Borough and Developers was modified on September 16, 2009, and, under this revised agreement, the Borough retained ownership of portions of the park property encompassed by the entirety of the Meisel Parcel and a part of Northern Parcel UPI 40-1.23.1. This retained property included all three of the park's ponds, its trails, the parking area, the "millrace", the Victims of Violence Memorial, and "surrounding open

space/park areas." Second Amendment to Purchase Agreement, 9/16/09, at 2 (R.R. at 1231a). However, with respect to both of these parcels, the Borough granted to the Developers:

> free, uninterrupted perpetual and/or temporary (as applicable) easements over, under and through the Park Property as [Developers] reasonably require[] in order to (i) construct any improvements and perform any work on the Park Property shown on or required by the [Borough's] Conditional Use Approval, approved final subdivision and/or land development plans, or by other governmental approvals, including any environmental remediation (ii) construct or extend utilities to serve the development of all or any part of the remainder of the Property, Additional Property or Option Property, (iii) discharge storm water into the ponds, and (iv) maintain such improvements to the extent of any ongoing maintenance responsibility of the [Developers] or of any community association organized to maintain common amenities of [Developers'] development.

*Id.*

In July 2010, the Borough's Board of Supervisors granted Developers conditional use approval for the construction of their proposed development, which required that Northern Parcel UPI 40-1.23.1 and the Meisel Parcel continue to be public open space, but also allowed Developers the permanent right to discharge stormwater into Fourth Lake, the pond on Northern Parcel UPI 40-1.23.1. The Borough additionally pledged to obtain removal of any deed restrictions mandated by the Project 70 Act. Once the construction of the development was complete, the Borough was entitled under the agreement to receive a percentage of the sale price of each of the dwelling units, and it pledged to use those monies, in conjunction with other public funds, to build a new firehouse in the Borough. Orphans' Court Opinion, 10/7/10, at 8. This planned disposition by the Borough of these five parcels of parkland gave rise to the present litigation.

## B. Procedural History

In January 2009, residents of the Borough, Ann M. Feldman, Marion Ungrich, Evelyn Hopkins, and Rosetta Tootle — who presently live near the park property — in conjunction with a non-profit corporation they had founded with other Borough residents and other interested parties — "Friends of Kardon Park" — commenced an action in equity in the Chester County Court of Common Pleas for declarative and injunctive relief to prohibit the Borough from carrying out the planned sale of the park property. In February 2009, a similar action, seeking the same prohibitory injunction, was filed in the same court by Kim Manufacturing Company, which owns and operates a metal fabrication company adjacent to the park property on its western side, and by Stewart Hall, L.P., which owns the land on which Kim Manufacturing is situated. (Collectively these parties, who are the designated appellees in this matter, will be referred to as "Objectors").

In March 2009, the Borough filed a petition with the Chester County Orphans' Court seeking approval for the sale. The petition alleged that the orphans' court had jurisdiction of the matter under the DDPA.[13] The orphans' court, by the Honorable Katherine B.L. Platt, subsequently consolidated the pending action for declaratory and injunctive relief with the orphans' court suit, and granted Developers leave to intervene.[14] In September and November 2009, the orphans' court conducted five days of hearings, and, after considering the voluminous evidence and arguments of the parties, issued an opinion in October 2010 denying the Borough's petition.

---

[13] The Borough also raised a claim under the Inalienable Property Act, 20 Pa.C.S. §§ 8301-8306, which the orphans' court rejected. The Borough did not further appeal this ruling; thus, its propriety is not at issue in the present appeal.

[14] The Office of Attorney General also entered an appearance in this matter at that time in its capacity as *parens patriae*, but it has taken no position throughout the litigation as to whether the Borough should be permitted to sell the subject property, and it has not filed a brief in the present appeal.

Before addressing the orphans' court's analysis, we briefly discuss the DDPA. As our Court observed in the decision of *In re Erie Golf Course*, 992 A.2d 75 (Pa. 2010), the fundamental purpose of the DDPA, enacted by the General Assembly in 1959, was to delineate "the fiduciary nature of municipalities' obligations relative to donated and dedicated properties and provide for orderly relief therefrom in appropriate circumstances." *Id.* at 86. As relevant to the present matter, the DDPA deems lands situated within a political subdivision which have been "dedicated to the public use . . . as a public facility" as "held by [the] political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee."[15] 53 P.S. § 3382. The DDPA further requires that "[a]ll such lands . . . held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated . . . except insofar as modified by court order pursuant to this act." *Id.* § 3383. The DDPA sets forth the conditions and process for such court ordered modification in Section 3384 thereof, which permits a political subdivision to petition the orphans' court for relief from its obligations as trustee of property held in trust as a public facility "[w]hen, in the opinion of the political subdivision which is the trustee, the continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest." *Id.* § 3384. If the orphans' court determines that the political subdivision has established these criteria, Section 3384 allows the orphans' court to allow the political subdivision to do the following:

> (1) Substitute other lands or property of at least equal size and value held or to be acquired by the political subdivision in exchange for the trust property in order to carry out the trust purposes; (2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes; (3) In the event the original trust purpose is no

---

[15] The DDPA defines a "public facility" as "any park, theatre, open air theatre, square, museum, library, concert hall, recreation facility or other public use." 53 P.S. § 3381.

longer practicable or possible or in the public interest, apply the property or proceeds therefrom in the case of a sale to a different public purpose; [and] (4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record: Provided, only, That the court is satisfied upon hearing the evidence that there is no acceptance by implication arising out of public user or otherwise, the court shall also determine the consideration, if any, to be paid to the political subdivision.

*Id.*

Section 3386 of the DDPA reserves to political subdivisions a right of control over public lands[16] which they acquire by purchase or condemnation:

Nothing in this act shall be construed to limit or affect the control by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation.

*Id.* § 3386. Although this provision facially excludes from the scope of the DDPA any lands which a political subdivision acquires by purchase or condemnation, as discussed at greater length herein, in *Erie Golf Course* we did not interpret Section 3386 in that broad manner.

In the instant case, to adjudicate the Borough's claim of relief under the DDPA, the orphans' court looked to *Erie Golf Course*.[17] The orphans' court regarded this case

---

[16] The DDPA defines lands as "all real estate, whether improved or unimproved." 53 P.S. § 3381.

[17] In *Erie Golf Course*, our Court considered whether the city could obtain authorization from the orphans' court under the DDPA to sell a golf course which it had purchased from a private club, and which the city had maintained for 80 years as a public golf course as required by a restrictive covenant in the deed of conveyance. In brief, our Court ruled therein that the DDPA applied to all dedications of property to public use, whether or not there was a formal record of such a dedication by the public governing body which was responsible for administering the property as trustee for the benefit of the public; that the DDPA statutorily incorporated principles of the venerable common law public trust doctrine, and, to the extent that it modified that doctrine, superseded it; that the orphans' court had "controlling discretion" to decide whether to permit the sale (continued…)

as establishing that it, not the Borough, possessed the ultimate discretion to determine whether the park property was dedicated to public use as required by Section 3382 of the DDPA, and whether the Borough met the required criteria to sell the park property as set forth in Section 3384 of that law — *i.e.*, whether its original use "is no longer practicable or possible or has ceased to serve the public interest." Orphans' Court Opinion, 10/7/10, at 13.

Noting that our Court in *Erie Golf Course* failed to define what constitutes a "dedication to public use" under Section 3382, the orphans' court utilized a definition offered by the Commonwealth Court. *See White v. Twp. of Upper St. Clair*, 799 A.2d 188, 193 (Pa. Cmwlth. 2002) ("Dedication may be found in a single act, such as the giving of a deed or the recording of a plan, or it may be found from a series of acts, all consistent with and pointing to the intention to dedicate."). Accordingly, to determine if the park had been dedicated to public use, the court considered the Borough's stated reasons for acquiring the land to create the park — to expand the available land in the Borough which could be utilized for recreation activities, historical, and conservation purposes — as well as the Borough's lengthy history of maintaining and making improvements to the park, and the continuous recreational and other public uses of the park by the community. Although the court noted that certain areas of the park were used more heavily by patrons — such as the walking trail, the areas around the Victims of Violence Memorial, the ponds, and the parking areas — the court nonetheless concluded that the public had always been given access to the entire park property and

---

(…continued)
of property held in trust for the benefit of the public; and that Section 3386 of the DDPA did not exclude from the DDPA's scope of coverage purchased property which is held for public trust purposes. *Erie Golf Course*, 992 A.2d at 86-89 & n.14. The Borough filed an *amicus* brief in that case.

used those other areas from time to time. Consequently, the court concluded that the park property, as a whole, was dedicated to public use.

The court next considered whether the use of the park property for public purposes had become impossible, impracticable, or no longer served the public interest. Observing that there was a complete lack of legal authority regarding the burden of proof the Borough had to meet to demonstrate these factors, the court chose to apply a preponderance of the evidence standard. The court rejected the Borough and Developers' argument that the contaminated soil in the western portion of the park rendered the park, as a whole, unsuitable for its continued use by the public. The court found that, even after both environmental assessments identified the presence of heavy metals and toxic waste imbedded in the soil, the Borough took no action to restrict the public's access to the whole park, including its western areas which were the most heavily polluted, and the Borough continued to maintain the park so that it was open for the same public activities for which it had historically been used.

Moreover, the court noted that the Golder assessment found nothing which demonstrated that the park's use by the public — the majority of which, as Golder determined, was for brief periods of time ten minutes or less — posed any substantial health risk to patrons, even those who continued to use the western areas of the park. Accordingly, in the court's view, because the evidence of record showed the public use to which the park was dedicated remained unchanged even after the identification of the contaminated soil, the Borough failed to demonstrate by a preponderance of the evidence that the park's original use was impracticable or impossible, or that the park had ceased to serve the public's interest. Hence, the court ruled that the Borough did not have authority under the DDPA to sell any of the park property to the Developers.

The Borough and Developers appealed to the Commonwealth Court, which reversed in a unanimous *en banc* decision.[18] *Borough of Downingtown v. Friends of Kardon Park*, 55 A.3d 163 (Pa. Cmwlth. 2012) ("*Downingtown I*"). While the orphans' court based its decision entirely on the DDPA, given that the Borough had filed its petition seeking relief under that act, the Commonwealth Court, of its own volition, introduced the question of the effect the Project 70 Act would have on the Borough's right to dispose of the Northern Parcels; and, over the opposition of Objectors, entertained an argument from the Borough and Developers that, since the Borough had acquired the Southern Parcels by eminent domain, the Borough had the right to dispose of the Southern Parcels under Section 310(a) of the Eminent Domain Code governing disposition of "abandoned" property. *See* 26 Pa.C.S. § 310(a).[19][20]

---

[18] Judge McCullough was the author of the decision, and she was joined by then President Judge Pellegrini, and Judges Leadbetter, Cohn Jubelirer, Simpson, Brobson and Covey.

[19] This section provides:

> **(a) Disposition of property.—**If a condemnor has condemned a fee and then abandons the purpose for which the property has been condemned, the condemnor may dispose of it by sale, lease, gift, devise or other transfer with the following restrictions:
>
> > (1) If the property is undeveloped or has not been substantially improved, it may not be disposed of within ten years after condemnation without first being offered to the condemnee at the same price paid to the condemnee by the condemnor.
> >
> > (2) If the property is located outside the corporate boundaries of a county of the first or second class and is undeveloped or has not been substantially improved and was devoted to agricultural use at the time of the condemnation, it may not be disposed of within 21 years after condemnation without first being

(continued…)

With respect to the Northern Parcels and the Project 70 Act, the Commonwealth Court, noting that these parcels had been acquired by Project 70 Act funds, concluded that the orphans' court erred in failing to consider the impact of the Project 70 Act on the Borough's right to convey the parcels under the DDPA.[21] The Commonwealth Court opined that Section 3946.20 of the Project 70 Act required the express approval of the General Assembly in order for the owner of lands acquired through the use of Project 70 Act funds to dispose of them. The court reasoned that neither the common law public trust doctrine, nor the DDPA — which the court, quoting from our decision in *Erie Golf Course*, found to incorporate the "'salient common-law principles' of the public trust doctrine" — restricted the Borough from selling Northern Parcel UPI 11-4-13 since the General Assembly had released it from Project 70 Act restrictions in 1999, and purportedly "specifically authorized" the conveyance of this parcel to Developers. *Downingtown I*, 55 A.3d at 173 (quoting *Erie Golf Course*, 992 A.2d at 86).

The court also found support for this conclusion in Section 3386 of the DDPA, which provides that "[n]othing in this act shall be construed to limit or affect the control

---

(…continued)

> offered to the condemnee at the same price
> paid to the condemnee by the condemnor.

26 Pa.C.S. § 310(a). Problematically, as discussed more fully herein, the condemnations of these parcels were effective in the 1970s, and this section is applicable only to "condemnations effected on or after" September 1, 2006. Act of May 4, 2006, P.L. 112, No. 34 § 6.

[20] The orphans' court did not address the issue of Section 310(a)'s applicability in its opinion, as it was not raised as a basis for relief in the Borough's petition in the orphans' court; rather, it was mentioned for the first time in a pretrial memorandum filed by Developers. Although Objectors argued to the Commonwealth Court that this issue was waived as, in their view, it was being presented for the first time on appeal, the Commonwealth Court rejected that claim, and, as no party presently asks us to revisit this question, we do not address it.

[21] Although recognizing that it was raising this issue *sua sponte*, the court considered its remand as adequately permitting the parties and the orphans' court the opportunity to fully consider this question. *Downingtown I,* 55 A.3d at 174 n.14.

by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation," 53 P.S. § 3386, and language in *Erie Golf Course* interpreting that section, where we observed that it was "most reasonable to construe [Section 3386] as redressing a concern for the preservation of such rights and interests as a political subdivision may have acquired in connection with a purchase." *Erie Golf Course*, 992 A.2d at 88. In the Commonwealth Court's estimation, the use of Project 70 Act funds to acquire the Northern Parcels and the General Assembly's release of them from Project 70 Act restrictions constituted a conferral of such rights to the Borough that "may well be the dispositive factors with respect to these parcels." *Downingtown I*, 55 A.3d at 173 n.16. The court concluded that, because the orphans' court should have considered the provisions of the Project 70 Act in conjunction with the DDPA in determining whether the Borough had the authority to convey the Northern Parcels to the Developer, it deemed it necessary to remand to the orphans' court for that assessment; hence, it vacated the order of the orphans' court with respect to the Northern Parcels.

Regarding the Southern Parcels, the Commonwealth Court found that the Project 70 Act did not apply since they were acquired through eminent domain, and there was no evidence that Project 70 Act funds were used to pay the condemnees. However, the court observed that Section 310(a) of the Eminent Domain Code permits a governmental body to sell property acquired by condemnation if the public purpose for which it was condemned has been abandoned, and the other applicable conditions enumerated in Section 310(a) are met. Also, the court noted that "there must be an intent to abandon the condemned property coupled with external acts to achieve that end; mere non-use or lapse of time is not an abandonment." *Id.* at 175. While the Commonwealth Court deemed these determinations to be ones for the finder of fact, it

observed that, in this case, the orphans' court failed to make any findings regarding these matters, and did not consider whether the provisions of the DDPA would supersede the Eminent Domain Code; thus, the court vacated the orphans' court's order with respect to the Southern Parcels and remanded to the orphans' court for further proceedings on these questions. The Commonwealth Court reiterated that our Court's statements in *Erie Golf Course* with respect to Section 3386's potential preservation of property rights acquired by a municipality, which it viewed as potentially including a right to freely dispose of property under Section 310(a), "could be the dispositive factor" with respect to the validity of the proposed sale of the Southern Parcels to the Developers. *Id.* at 175 n.19.

Lastly, the Commonwealth Court found that, because the easements granted to the Developers over the Meisel Parcel were "ancillary to the uses on the other parcels," it was necessary to vacate the orphans' court's order with respect to those easements and to remand for that court to consider "whether the construction, maintenance and utility easements as well as permission to discharge storm water into the two lakes are inconsistent with the use of the parcel as parkland." *Id.* at 176.[22]

---

[22] The Commonwealth Court addressed only the question of whether the Borough's grant of the easements over the Meisel Parcel was permissible under the DDPA. However, while the Borough and Developers' appeal in *Downingtown I* was pending before the Commonwealth Court, the Borough and Developers filed another petition in the orphans' court seeking a ruling that its approval was not required for the grant of the easements over the Meisel Parcel or the other easements on Northern Parcel UPI 40-1-23.1. Judge Platt granted the petition, finding that the DDPA was not applicable to the easements, reasoning that the grant of the easements "did not constitute a sale or a change in the use of the property." Orphans' Court Opinion, 11/21/13, at 14. A panel of the Commonwealth Court reversed in a unanimous unpublished memorandum opinion, also authored by Judge McCullough, which noted that "[a]t the very least, the proposed easements with respect to these parcels will alter the use of, or constitute an alienation of, portions of Kardon Park, thereby implicating the DDPA and necessitating Orphans' Court approval." *In re Council of Borough of Downingtown*, No. 2205 C.D. 2011 at 3 (unpublished memorandum filed June 18, 2013). The panel remanded for further (continued…)

Subsequent to the Commonwealth Court's decision in *Downingtown I*, the General Assembly enacted legislation removing some of the Project 70 Act restrictions from Northern Parcel UPI 40-1-23.1.[23] *See* Act of Oct. 24, 2012, P.L. 1293, No. 162, § 6. However, this legislation required the following additional conditions be met: the Borough receive equal to or greater than the fair market value for the portion of the park property on which Project 70 Act restrictions were removed; the Borough reserve, via deed restriction, a minimum of 20 acres of current park property for continued use as a public park; the Borough deposit the revenue realized from the sale of Project 70 Act properties into an interest bearing account, and expenditure of monies in that account be restricted to making improvements to the park in accordance with a development plan approved by the Department of Conservation and Natural Resources ("DCNR"); and, after five years, the Borough disgorge any funds left in that account to the DCNR to be used to fund general conservation and recreation grants. *Id.*

On remand from the Commonwealth Court, the orphans' court, following the Commonwealth Court's directive, first addressed whether the Eminent Domain Code superseded the DDPA and, thus, permitted the Borough to sell the Southern Parcels without its approval. The Borough and Developers, citing Section 102 of the Eminent

---

(…continued)
proceedings in that case so that the orphans' court could make specific findings with respect to the DDPA's application to the grant of both easements. After remand, that case was consolidated for disposition by the orphans' court with the cases remanded to it in *Downingtown I*.

[23] Although the legislation does not specifically refer to this parcel by its UPI number, the orphans' court, on remand from the Commonwealth Court, credited the testimony of a professional engineer, who had prepared the official description of the property to be released under the 2012 legislation, that the physical description of the property contained therein was the same as the land which constituted tax parcel UPI 40-1-23.1. Orphans' Court Opinion, 11/21/13, at 12.

Domain Code,[24] contended that the code provided the "complete and exclusive procedure" governing how a municipality may dispose of condemned lands, whereas Objectors countered that the DDPA and the Eminent Domain Code must be construed together and that the DDPA applied to the Southern Parcels, as they had been condemned specifically to create a park and the land continued to be actively used for that purpose. Orphans' Court Opinion, 11/21/13, at 6. The orphans' court sided with Objectors and found that the DDPA applied, notwithstanding the purported exclusivity language in the Eminent Domain Code.

The orphans' court explicitly rejected the Commonwealth Court's suggestion in *Downingtown I* that Section 3386 of the DDPA potentially precluded the application of the DDPA to property acquired by condemnation. The court noted that, in *Erie Golf Course*, our Court recognized that Section 3386, while preserving all rights and interests a municipality acquired in a piece of property through its purchase, nevertheless considered such purchased property to be subject to the provisions of the DDPA. *See id.* at 5-6 ("We do not believe, however, that [Section 3386] was intended to remove entirely from the Act's purview (and thus maintain inflexible irrevocability relative to) any and all trust property that may in any sense of the word be said to have been purchased." (quoting *Erie Golf Course*, 992 A.2d at 88)).[25] The court deemed this

---

[24] This section states: "[t]his title provides a complete and exclusive procedure and law to govern all condemnations of property for public purposes and the assessment of damages." 26 Pa.C.S. § 102.

[25] While we recognized in *Erie Golf Course* that the General Assembly, through the enactment of the DDPA, desired to give municipalities additional options by which they could seek to divert public trust property from its intended use beyond those available to them under the common law public trust doctrine, we did not read Section 3386 of the DDPA as excluding from orphans' court review a political subdivision's diversion of public trust property which it initially acquired through purchase. Rather, we considered the fact that the purchased property had been dedicated to public use by the city after purchase as the dispositive consideration implicating the protective provisions of the (continued…)

reasoning equally applicable to property which a municipality has acquired through condemnation; hence, it concluded that a municipality's rights to dispose of condemned property were constrained by the provisions of the DDPA, and, thus, within its jurisdiction to determine:

> In this case, the parcels acquired through condemnation were acquired for parkland purposes. As I found in the October 7, 2010 Opinion, the DDPA applies to the disposition of the Kardon Park parcels that have been used as parkland. Without the protection afforded public property by the DDPA, a municipality would have unchecked power to dispose of parkland and other trust property. The Commonwealth Court suggested that Section [3386] of the DDPA gives the Borough unfettered discretion to dispose of the Southern Parcels. 55 A.3d at 175, n: 19. This is inconsistent with the *Erie* Court's reluctance to find that Section [5536] removed "entirely from the [DDPA]'s purview" certain trust property. *Erie, supra.* With the guidance from the Supreme Court in *Erie* regarding Section [3386] of the DDPA, I find that the Eminent Domain Code does not exempt the Southern Parcels from the applicability of the DDPA. Accordingly, the DDPA applies and Orphans' Court continues to have jurisdiction in this case.

*Id.* at 7.[26]

---

(…continued)
DDPA due to the substantial public interests created by the dedication. *See* 992 A.2d at 88-89.

[26] The orphans' court, apparently uncertain as to whether the Commonwealth Court's remand order in *Downingtown I* also required it to make findings as to whether the park property could be deemed abandoned for purposes of Section 310(a) of the Eminent Domain Code, proceeded to consider that question, utilizing the Commonwealth Court's two-part test for abandonment recited in *Downingtown I* — *i.e.,* the condemnor must show an intent to abandon the condemned property, and there must be external acts to accomplish the abandonment, other than non-use of the property or the passage of time. The orphans' court found that the Borough had owned the Southern Parcels for more than 21 years, and demonstrated an intent to abandon those lands as far back as 1999, when it began preparing the park for commercial use. The orphans' court concluded that the Borough's entry into the agreements of sale for the lands constituted acts in furtherance of its intention to abandon them.
(continued…)

Next, per the Commonwealth Court's instructions, the orphans' court considered whether, in light of the Project 70 Act releases, the Borough was nonetheless required to obtain its approval under the DDPA for sale of the Northern Parcels, and found that the Borough was not required to do so. The court observed that the Project 70 Act "has specific guidelines for disposing of property acquired with funds made available pursuant to the Act," and that it had not previously considered the application of those provisions when rendering its prior decision, inasmuch as the Borough had not argued the applicability of the Project 70 Act in those proceedings. *Id.* at 13. The court, noting the Commonwealth Court's finding in *Downingtown I* that the General Assembly's passage of legislation in 1999 releasing Northern Parcel UPI 11-4-13 from Project 70 Act restrictions "specifically authorizes the Borough's conveyance of [that parcel] to Developers and that neither the DDPA nor the common law public trust doctrine prohibits the sale of parcel 11-4-13 to Developers," decided that the legislature's 2012 enactment releasing Northern Parcel UPI 40-1-23.1 from Project 70 Act restrictions likewise authorized the Borough to dispose of those parcels.[27] *Id.*

Finally, the orphans' court addressed the question of whether the easements granted to Developers for the Meisel Parcel were inconsistent with the use of the parcel

(…continued)

Tangentially, the orphans' court additionally opined that, if the Commonwealth Court found the Borough's right to dispose of these parcels was exclusively conferred by the Eminent Domain Code, then the Objectors had no standing to challenge the sale as they are not condemnees, who are the only parties with standing under that code to make such a challenge. While, on appeal, the Commonwealth Court reversed this aspect of the orphans' court's decision, we did not grant allowance of appeal to review that question.

[27] The orphans' court additionally ruled that Objectors did not have standing to seek enforcement of Project 70 Act restrictions, as only the Commonwealth had statutory authority under 72 P.S. § 3946.20(e) to seek enforcement relief from a court, or to pursue other remedies. On appeal, the Commonwealth Court reversed this aspect of the orphans' court's decision; however, we did not grant allocatur to review that part of the Commonwealth Court's decision.

as parkland.[28]  The court determined that the expert testimony it had received during the remand hearing established that the easements would not be inconsistent with the Meisel parcel's current use as public parkland.  Accordingly, in the orphans' court's view, the DDPA was not implicated, and so it found that there was no need for it to conduct further proceedings under that act in order for it to determine if the conveyance of the easements by the Borough was permissible thereunder.  Given that neither party was wholly successful in obtaining their desired relief, both parties appealed to the Commonwealth Court.

Objectors as well as the Borough and Developers filed cross-appeals to the Commonwealth Court, which considered the case *en banc*, and affirmed the orphans' court's rulings in a 4-3 *per curiam* decision in *In re Borough of Downingtown*, 116 A.3d 727 (Pa. Cmwlth. 2015) ("*Downingtown II*").[29]  Therein, that tribunal first considered the Borough and Developers' challenge to the orphans' court's determination that the DDPA mandated that court's approval to dispose of the Southern Parcels, which, as noted, had been acquired via condemnation.  The Commonwealth Court first observed that the DDPA applies to "[a]ll lands . . . dedicated to the public use," and requires that "all such lands . . . held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by a court order pursuant to this act."  *Id.* at 734 (citing Sections 3382 and 3383).  Thus, the court deemed the DDPA to apply to the Southern Parcels because, in

---

[28]  Although, as indicated previously, *see supra* note 22, the orphans' court had consolidated the case involving the easements across Northern Parcel UPI 40-1-23.1, inexplicably, it addressed only the easements across the Meisel Parcel.

[29]  The *en banc* panel was comprised of then-President Judge Pellegrini, and Judges McGinley, Cohn-Jubelirer, Simpson, Brobson, McCullough, and Covey.  To the *per curiam* opinion, Judge Simpson filed a concurring and dissenting opinion, joined by Judge McGinley, and Judge McCullough filed a dissenting opinion.

its view, the evidence of record, recited by the orphans' court in its first opinion, established "that the Borough has committed the Southern Parcels to public use and the public has accepted this use." *Id.* at 736.

The court deemed Section 3384 of the DDPA to govern the Borough's proposed sale of the Southern Parcels. The court noted that, in order for a political subdivision to convey property under the DDPA, it must initially meet the requirements of the first paragraph of Section 3384, which necessitates that the political subdivision show that "continuation of the original use of the property is no longer practicable or possible and has ceased to serve the public interest." *Id.* at 735 (quoting Section 3384). The court agreed with the orphans' court's finding that the Borough could not show that the continued use of these parcels was no longer practicable or possible, nor could it demonstrate that Kardon Park ceased to serve the public interest. *Id.*

In the court's view, inasmuch as the Borough did not meet Section 3384's threshold criteria, Section 3386 — reserving political subdivision's rights in property acquired by purchase or condemnation — was not implicated. Even so, the court considered the application of Section 3386 as it was interpreted by our Court in *Erie Golf Course*. The Commonwealth Court agreed with the orphans' court's extension of our Court's holding in that case to property acquired by condemnation. Embracing the orphans' court's rationale, the court found that, since our Court had declined to read Section 3386 as excluding purchased property from the DDPA, it would be "illogical to conclude that the same reasoning would not apply to property acquired by condemnation." *Id.* at 736.

Moreover, the court rejected the contention by the Borough and Developers that Section 310(a) of the Eminent Domain Code compelled a different result. The court considered this section as applicable only to sales of condemned land for which the

public use of that land had been abandoned. The court found that the purpose for which the Southern Parcels were condemned, as offered by the Borough in its notice of condemnation, was "to expand and enlarge recreation places and space within the borough limits, [and that] the Borough achieved that purpose and Kardon Park continues to satisfy that purpose in the present day." *Id.* at 737 (internal quotation marks omitted). The court therefore affirmed the orphans' court's order requiring the Borough obtain its approval for the sale of the Southern Parcels.

Regarding the issue of whether the Project 70 Act or the DDPA governed the Borough's right to sell the Northern Parcels, the court recounted that, in *Downingtown I*, it had ruled that the General Assembly's release, via legislation, of Northern Parcel UPI 11-4-13 from Project 70 Act restrictions was controlling of the question of the Borough's right to dispose of that parcel, and that neither the common law public trust doctrine nor the DDPA precluded the sale. The court agreed with the lower court's determination that the General Assembly's 2012 legislative release of Northern Parcel UPI 40-1-23.1 from Project 70 Act restrictions had the same legal effect and, thus, that the Borough could freely convey that parcel as well, except for the portion of that parcel which the Borough would retain as a public park in order to meet the condition in the 2012 legislation that the Borough keep 20 acres for that purpose. The court reasoned that "[t]he releases by the General Assembly essentially voided the dedication required under the Project 70 Act and permit[ted] the conveyance of these parcels. To hold that these parcels are also subject to the disposition requirements of the DDPA would render [Section 3946.20 of the Project 70 Act] a nullity." *Id.* at 739.

Additionally, the court viewed this conclusion as consistent with the principle of statutory construction set forth in Section 1933 of the Statutory Construction Act[30] —

---

[30] This section provides:
(continued…)

that whenever two statutes are irreconcilable, the statute which is more specific prevails — and the court, ostensibly regarding the DDPA and the Project 70 Act as irreconcilable, found the Project 70 Act, which specifically applied to property purchased with Project 70 Act funds, controlled over the more generally applicable DDPA. Consequently, the court held that the orphans' court did not err in concluding that, in light of the legislature's release of the Project 70 Act restrictions on the Northern Parcels, orphans' court approval under the DDPA was not required for the Borough to sell them to Developers.

Lastly, the court purported to address the question of whether the Borough's grant of easements to the Developers over both the Meisel Parcel and Northern Parcel UPI 40-1-23.1 required orphans' court approval. In conducting its review, however, the court was limited to the orphans' court's findings regarding the Meisel Parcel as, in its opinion, it had not discussed the impact of the easements on Northern Parcel UPI 40-1-23.1.[31] The Commonwealth Court nevertheless found the orphans' court's findings to

---

(…continued)

**§ 1933. Particular controls general**
Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa.C.S. § 1933

[31] As set forth *supra*, the orphans' court discussed only the easements on the Meisel Parcel.

be supported by the record.  Accordingly, the court affirmed the orphans' court's ruling

that the DDPA was not implicated by the Borough's grant of the easements.[32]

All parties filed petitions for allowance of appeal from the Commonwealth Court's

order affirming the orphans' court.  We granted the joint petitions for allowance of

---

[32] Judge Simpson authored a concurring and dissenting opinion, joined by Judge McGinley, in which he joined the majority opinion with respect to its resolution of the issues involving the Northern Parcels and the Meisel Parcel; however, he dissented as to the majority's ruling regarding the Southern Parcels. Judge Simpson noted that there is a conflict between the DDPA and the Eminent Domain Code as to which entity has controlling discretion to decide when property held in public trust by a governmental body is no longer being used for a public purpose and may be disposed of.  As interpreted by *Erie Golf Course*, the DDPA vests such decision-making authority in the orphans' court, whereas, under the Eminent Domain Code, the governmental body as condemnor retains sole authority to decide whether the public use of the property has been abandoned.  Judge Simpson suggested that, to resolve this apparent statutory conflict, it would be proper to apply the approach taken by our Court in *Commonwealth v. Ogontz*, 483 A.2d 448 (Pa. 1984), and reaffirmed in *SEPTA v. City of Philadelphia*, 101 A.3d 79 (Pa. 2014), which requires that the statutory language first be examined to see if it can be determined that the legislature intended one entity to have preeminent decision-making authority.  Employing this approach, Judge Simpson concluded that the language in Section 3386 of the DDPA — which states that "[n]othing in this act shall be construed to limit or effect the control by a political subdivision of public lands . . . acquired by such political subdivision by purchase or condemnation," 53 P.S. § 3386 — indicates that the condemning municipality should be the decision-maker regarding public trust property acquired by condemnation.  Judge Simpson considered our decision in *Erie Golf Course* to be distinguishable as, given the ambiguity in the term "purchase" as used in the DDPA, he viewed it as an attempt by our Court to protect a political subdivision from being subject to the more restrictive pre-existing common law public trust doctrine which more heavily curtailed discretionary rights to dispose of purchased property, while not entirely excluding such purchased property from the scope of the DDPA's application.  By contrast, Judge Simpson discerned no ambiguity in the term "condemnation" and, hence, he considered Section 3386 to clearly exclude condemned property from its ambit.

Judge McCullough joined the majority opinion in all respects except for its affirmance of the orphans' court decision regarding the grant of the easements for the Meisel Parcel and Northern Parcel 40-1-23.1.  In Judge McCullough's view, the easements violated the DDPA because they were granted solely for the benefit of Developers so that they could comply with the open space requirements of the Borough's ordinance; thus, she opined that the easements impermissibly favored a private use of public land.

appeal of the Borough and Developers at 16-19 MAP 2016, and the petitions of Objectors at 12-15 MAP 2016 and 20-23 MAP 2016, in order to consider the following issues. *See In re Borough of Downingtown*, 132 A.3d 978 (Pa. 2016) (order).

***Appeal of Borough and Developers at 16-19 MAP 2016:***

> 1. Where a municipality has satisfied the requirement to dispose of condemned property under Section 310(a) of the Eminent Domain Code by abandoning the purpose for which the property was condemned, does the [DDPA] nonetheless require judicial approval before a municipality may dispose of that property?

> 2. Where a municipality intends to abandon property acquired by condemnation and where that intent is coupled with external acts to achieve such abandonment, has the purpose of the property been "abandon[ed]" for purposes of Section 310(a) of the Eminent Domain Code?

***Appeal of Objectors at 12-15 MAP 2016 and 20-23 MAP 2016:***

> 1. Does the removal of Project 70 Act deed restrictions also remove all public trust interests in dedicated parkland, such that judicial review of the sale of such parkland would no longer be required under the [DDPA]?

> 2. May municipalities convey private development easements over public parkland without first obtaining Orphans' Court approval under the DDPA?

## II. Analysis

### A. Appeal of Borough and Developer[33]

Both of the issues raised by the Borough and Developers involve the application of Section 310(a) of the Eminent Domain Code to the question of the Borough's right to dispose of the Southern Parcels, because the Borough acquired title to those parcels

---

[33] The Borough and Developers have filed joint briefs with our Court.

via condemnation.[34]  In addition, the lower courts structured their analyses of the applicability of the DDPA to the disposition of those parcels based on their consideration of the interplay of the DDPA and Section 310(a).  Our grant of allowance of appeal was likewise predicated on a perceived need to resolve the legal question of whether the Borough was required to obtain orphans' court approval under the DDPA to sell these parcels, as the lower courts concluded, or whether the Borough had the unfettered right to sell them under Section 310(a).  In their briefs to our Court, the parties' arguments retain that focus.  Critically however, after further review, we conclude that Section 310(a) has no application to this matter.

Section 310(a) was enacted by Act 34 of 2006, Act of May 4, 2006, P.L. 112, No. 34, which repealed, *in toto*, the prior Eminent Domain Code, Act of June 22, 1964, Sp. Sess., P.L. 84, No. 6 (as amended 26 P.S. §§ 1–101 to 1–903 (repealed)), and created the present Eminent Domain Code, codified at Title 26 of the Pennsylvania Consolidated Statutes, 26 Pa.C.S. §§ 101-1106.  Section 6(1) of Act 34 expressly provides that, except for a provision not relevant herein, all provisions of Title 26 created by Act 34 "shall apply to all condemnations *effected on or after the effective date*" of the Act, which was September 1, 2006.  Act of May 4, 2006, P.L. 112, No. 34, § 6(1) (emphasis added).  Thus, the General Assembly unmistakably intended for Act 34 to apply prospectively, only to those condemnations "effected" after September 1, 2006.

As recounted above, the declaration of taking for Southern Parcel UPI 11-4-14.2 was filed by the Borough in 1974, and the declaration of taking for Southern Parcel UPI 11-4-14 was filed by the Borough in 1977.  Under the provisions of the Eminent Domain Code of 1964, as revised in 1969, which were applicable during that time period, the

---

[34] The Pennsylvania State Association of Township Supervisors has filed an *amicus* brief addressing the interplay of Section 310(a) of the Eminent Domain Code and the DDPA.

filing of a declaration of taking "effected" the condemnation. *See* 26 P.S. § 1-402 (repealed) ("Condemnation, under the power of condemnation given by law to a condemnor, which shall not be enlarged or diminished hereby, *shall be effected* only by the filing in court of a declaration of taking, with such security as may be required under section 403(a)." (emphasis supplied) (footnote omitted)).[35] Hence, by the explicit terms of the legislation creating the present Eminent Domain Code, the provisions of the current code, including Section 310(a), do not apply to the condemnations of the Southern Parcels since the condemnation of both was effected in the 1970s when the Borough filed their respective declarations of taking. Therefore, the provisions of Section 310(a) have no legal relevance to the Borough's right to dispose of these properties.

Moreover, Section 310(a) is not a mere reenactment of its statutory predecessor in effect at the time of these parcels' condemnation. *See* 26 P.S. § 1-410 (repealed).[36] Act 34 repealed and supplanted this statute entirely with Section 310(a), which contains

---

[35] Under the present Eminent Domain Code, a condemnation is likewise "effected" by the filing of a declaration of taking. *See* 26 Pa.C.S. § 302(1) ("Condemnation under the power of condemnation given by law to a condemnor shall be effected only by the filing in court of a declaration of taking with the security required under section 303(a) (relating to security required).").

[36] This section stated in relevant part:

> If a condemnor has condemned a fee and thereafter abandons the purpose for which the property has been condemned, the condemnor may dispose of it by sale or otherwise: Provided, however, That if the property has not been substantially improved, it may not be disposed of within three years after condemnation without first being offered to the condemnee at the same price paid to the condemnee by the condemnor . . . The condemnee shall be served with notice of the offer in the same manner as prescribed for the service of notices in subsection (b) of section 405 of this act, and shall have ninety days after receipt of such notice to make written acceptance thereof.

26 P.S. § 1-410(a) (repealed) (footnote omitted).

similar, but nonetheless distinct, provisions.[37]   Therefore, it would be jurisprudentially imprudent for us to presently interpret § 1-410 and consider its operation in conjunction with the DDPA, based on the parties' arguments with respect to Section 310(a).  This is particularly so given that the Commonwealth Court and orphans' court decisions rested entirely on their interpretation and construction of Section 310(a) in conjunction with the DDPA.   Furthermore, we have no advocacy from the parties on the prospectivity question, as their arguments solely rest on the assumed applicability of Section 310(a).

---

[37] Section 310(a) provides:

> **(a)  Disposition  of  property.--**If  a  condemnor  has condemned a fee and then abandons the purpose for which the  property  has  been  condemned,  the  condemnor  may dispose of it by sale, lease, gift, devise or other transfer with the following restrictions:
>
> (1)  If  the  property  is  undeveloped  or  has  not  been substantially improved, it may not be disposed of within ten years after condemnation without first being offered to the condemnee at the same price paid to the condemnee by the condemnor.
>
> (2)  If  the  property  is  located  outside  the  corporate boundaries of a county of the first or second class and is undeveloped  or  has  not  been  substantially  improved  and was  devoted  to  agricultural  use  at  the  time  of  the condemnation, it may not be disposed of within 21 years after  condemnation  without  first  being  offered  to  the condemnee at the same price paid to the condemnee by the condemnor.
>
> (3)  If  the  property  is  undeveloped  or  has  not  been substantially improved and the offers required to be made under paragraphs (1) and (2) have not been accepted, the property  shall  not  be  disposed  of  by  any  condemnor, acquiring agency or subsequent purchaser for a nonpublic use or purpose within 21 years after condemnation. Upon petition by the condemnor, the court may permit disposal of the  property  in  less  than  21  years  upon  proof  by  a preponderance  of  the  evidence  that  a  change  in circumstances has abrogated the original public purpose for which the property was taken.

26 Pa.C.S. § 310(a).

We therefore find it necessary to remand this matter to the Commonwealth Court for additional proceedings so that the parties may present arguments to the tribunal on this question, and for it to address, in the first instance, what impact, if any, the resolution of this question has on its prior conclusion that orphans' court approval was required under the DDPA for the sale of the Southern Parcels, even though they were acquired by the Borough through condemnation.

## B. Appeal of Objectors

We turn now to the Objectors' appeal. Notably, our resolution of this appeal is unaffected by our conclusion that the parties and the Commonwealth Court erroneously applied Section 310(a) of the Eminent Domain Code in the proceedings below.

### 1. The DDPA and the Project 70 Act restrictions[38]

We begin with the question of whether the General Assembly's release of Project 70 Act restrictions on the Northern Parcels precludes the application of the DDPA to the Borough's sale of these parcels. Objectors Kim Manufacturing and Stewart Hall ("Kim and Stewart") argue that the Commonwealth Court in *Downingtown II* misapplied our Court's decision in *Erie Golf Course* by deeming the DDPA's application to be dependent on the manner in which the property is acquired by the political subdivision, thereby disregarding the public purpose for which the property is subsequently dedicated, and the corresponding interest the public acquires because of this dedication. Kim and Stewart contend that the Commonwealth Court improperly considered the Northern Parcels to have been dedicated when they were acquired, in part, with Project 70 Act funds, and Project 70 Act deed restrictions were placed on the

---

[38] Kim Manufacturing and Stewart Hall L.L.P. have filed a joint brief, and the Friends of Kardon Park have filed their own separate brief.

properties. Kim and Stewart aver that the imposition of these deed restrictions was distinct from the dedication of the property which involved a series of actions on the part of the Borough over many years, and included the use of federal and state grant monies to undertake various improvements to the park, as well as the Borough's own maintenance activities and enhancements of the park. In Kim and Stewart's view, our Court in *Erie Golf Course* held that the application of the DDPA to the disposition of dedicated public property is dependent on acts of dedication and is not triggered merely by the insertion of Project 70 Act-like restrictions in a deed. Consequently, according to Objectors, the DDPA continues to apply to the Northern Parcels, as they were dedicated to use as a public park, even though the General Assembly removed the formal Project 70 Act restrictions from them.

Kim and Stewart assail what they consider the Commonwealth Court's further disregard of our Court's holding in *Erie Golf Course* that purchased properties which are committed to the public trust should not be excluded from the scope of application of the DDPA by Section 3386, which provides that the DDPA does not limit or affect a political subdivision's control of public lands it acquires through purchase (or condemnation). Kim and Stewart assert the Commonwealth Court in *Downingtown I* — a decision that tribunal relied on in *Downingtown II* for its holding regarding the Northern Parcels — improperly found that their acquisition with Project 70 Act funds, and the legislature's subsequent release of Northern Parcel 11-4-13 via the 1999 legislation, were the crucial factors determining their proper disposition. Instead, and again, Kim and Stewart proffer that our Court actually held in *Erie Golf Course* that it was the *dedication* of a property, and not the conditions of its original purchase, which were determinative of the DDPA's applicability.

Kim and Stewart further argue that the Commonwealth Court "erroneously pitted these laws against each other," by viewing the Project 70 Act as in conflict with the DDPA and considering the provisions of the Project 70 Act to control over those of the DDPA. Kim and Stewart Brief at 40-41. Instead, Kim and Stewart contend, the two acts can be read consistently so as to give effect to both. Kim and Stewart argue that the Project 70 Act and the DDPA "regulate different aspects of the same properties." *Id.* Specifically, in Kim and Stewart's view, the Project 70 Act establishes a contractual relationship between the Commonwealth and municipalities — with respect to properties acquired through those funds — via the deed restrictions which protect the Commonwealth's financial investment, and which only it can take legal action to enforce. The DDPA, on the other hand, establishes a process for disposing of properties dedicated to public use, and the public has been granted standing to enforce these public rights. Kim and Stewart, thus, characterize the Commonwealth's interest under the Project 70 Act as pertaining only to its financial interests and not to the public trust interests protected by the DDPA.

From Kim and Stewart's perspective, the Commonwealth Court's decision nullifies the DDPA and turns the Project 70 Act into a tool by which public parks may be sold with no judicial oversight simply because Project 70 Act money was used in their acquisition, even if the amount of such funds was small in comparison to the investment of other public funds in the park by the Commonwealth and the municipality. Kim and Stewart point out this could imperil the 500 municipal parks it estimates have been built throughout the Commonwealth using Project 70 Act funds, and would exclude the judiciary and the public from participation in the disposition process, as the DDPA requires; hence, it "would signal a statewide 'cash for parks' opportunity" which would

undermine the land preservation goals which the Project 70 Act sought to accomplish. Kim and Stewart Brief at 45.

In their joint brief, Objectors Friends of Kardon Park and Ann Feldman ("Friends"), stress that the Commonwealth Court decision is inconsistent given that the court also found that they had standing to challenge the sale, inasmuch as the Project 70 Act does not grant standing to citizens to challenge removal of Project 70 Act restrictions, whereas the DDPA does grant such standing. Thus, according to Friends, the Commonwealth Court's finding that they had standing was based on an implicit conclusion that the DDPA was applicable.[39]

Friends highlight the fact that Project 70 Act money paid for only one half of the total cost of the acquisition of the Northern Parcels, while the Borough paid for the remaining half, and, subsequent to their acquisition of the parcels, the Borough expended significant monies to improve them. Friends claim that allowing the sale of the Northern Parcels solely on the basis of the legislative release would disregard these years of public investment, and the dedication and public use of the park. Echoing Kim and Stewart's contention in this regard, Friends maintain that this would contravene the public purpose for which the original Project 70 Act funds were allocated — the acquisition and preservation of parklands for public use. Relatedly, Friends also aver that the orphans' court in its initial decision correctly treated the park property as a whole — i.e., as a single integrated park — and contend that allowing some of the park parcels to be sold in a piecemeal fashion would disrupt the park's continued use as such.

Friends suggest that deeming the Project 70 Act release to trump the requirements of the DDPA could constitute a violation of the separation of powers

---

[39] Kim and Stewart endorse this argument as well in their brief.

doctrine under Article V, Sections 1, 2, and 10 of the Pennsylvania Constitution, inasmuch as it could usurp the judiciary's obligation to decide whether the sale of a piece of publicly dedicated property violates the common law public trust doctrine as embodied in the DDPA.[40]  Friends postulate that allowing the Commonwealth Court's decision to stand could result in a situation where the orphans' court refuses to allow the sale of a piece of publicly dedicated property, which is also subject to Project 70 Act restrictions, but subsequent legislative release of the property from its Project 70 Act restrictions would be given controlling effect over this judicial decision and permit the sale.  Friends suggest that this scenario is avoidable only by recognizing that the DDPA and the Project 70 Act can be construed in *pari materia*, with effect given to all of the provisions of both statutes.[41]

The Borough and Developers respond that the decision by the Borough to accept Project 70 Act funds to purchase the Northern Parcels constituted a commitment by the Borough to use that land only for the specified Project 70 Act purposes, in this case recreational use as a public park.  Thus, the Borough and Developers argue that the dedication was effected at the time the Northern Parcels were acquired with Project 70 funds and Project 70 Act restrictions, not through any later actions by the Borough or the public.  Consequently, they reason, when the legislature authorized their release from Project 70 Act restrictions through the 1999 and 2012 legislation, and removed the restrictive covenant in the deeds, this voided their dedication and permitted their conveyance by the Borough.  The Borough and Developers reason that, because

---

[40]  Although Friends consider the DDPA to be the vehicle by which the public trust doctrine embodied in the Pennsylvania Constitution's Environmental Rights Amendment — Article I, Section 27 — is enforced, because, as we explain *infra*, we decide this case solely on statutory grounds, we need not express an opinion on this question.

[41] The Pennsylvania Land Trust has filed an *amicus* brief in support of the Objectors' suggested *pari materia* construction of the Project 70 Act with the DDPA.

Section 3946.20(b) of Project 70 Act limits the Borough's disposition of lands acquired with Project 70 Act funds to the purposes specified in the Act, and requires the imposition of the restrictive covenant in the deed of conveyance, removal of these restrictions through subsequent legislation "necessarily authorizes the municipality to 'dispose[] of or use[] the property'" for purposes other than those permitted by Project 70 Act. Borough and Developers Brief at 33 (citing 72 Pa.C.S. § 3946.20 9 (alterations original)). In the Borough and Developers' view, the legislation releasing the Northern Parcels, which was enacted while the parcels were still being used as parkland, must be viewed as specific legislation that governs the Borough's right to dispose of the parcels in the manner it sees fit, overriding any rights the public may have acquired under the DDPA — a statute the Borough and Developer consider to apply only to "the general category of dedicated property." *Id.*

The Borough and Developers aver that there is nothing in the Project 70 Act which requires that land acquired under that act be used solely for parkland purposes, and that Section 3946.20(b) of the Act specifically contemplates "other uses" for such property. *Id.* at 41. They contend that the 1999 and 2012 release legislation specifically allowed other uses for the Northern Parcels, and expressly conditioned the release on the Borough placing the same restrictions on other Borough property of identical size, thereby serving to further a fundamental purpose of the Project 70 Act — the conservation of land for recreational purposes. The Borough and Developers further note that the 2012 legislation anticipates that the Borough will develop the park, as it placed a number of restrictions on the sale of the property in connection with the Borough's planned development and the use of its proceeds. The Borough and Developers assert that requiring the application of the DDPA after this express legislative release will thwart this legislative permission. The Borough and Developers

discount Objectors' position that the Commonwealth Court's holding will potentially jeopardize hundreds of municipal parks, noting that such sales must also be approved by local governments and the General Assembly.

As the issue of the interrelationship between the Project 70 Act and the DDPA involves a question of statutory interpretation, our standard of review is *de novo,* and our scope of review is plenary. *City of Philadelphia v. City of Philadelphia Tax Review Board ex rel. Keystone Health Plan East, Inc.,* 132 A.3d 946, 952 (Pa. 2015). In interpreting the Project 70 Act and the DDPA, we are guided by the principles set forth in the Statutory Construction Act ("SCA"), 1 Pa.C.S. §§ 1501 *et seq.* The paramount objective of our interpretative task under the SCA is to "ascertain and effectuate the intention of the General Assembly" in enacting the legislation under review, *id.* § 1921(a), and the primary indication of the legislature's intent is the plain language of the statute, *Department of Environmental Protection v. Cumberland Coal*, 102 A.3d 962, 975 (Pa. 2014).

The SCA directs that "[e]very statute shall be construed, if possible, to give effect to all of its provisions" and that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(a), (b). However, Section 1921(c) of the SCA provides that, if the words of a statute "are not explicit," then a reviewing court may consider other factors, such as the statute's purpose, in order to ascertain legislative intent. *Id.* § 1921(c). Additionally, the SCA also furnishes certain presumptions which a reviewing court is entitled to utilize, two of which are relevant in this instance: (1) "the General Assembly intends the entire statute to be effective and certain," and (2) "the General Assembly intends to favor the public interest as against any private interest." *Id.* § 1922(2), (5).

We begin our analysis by noting that there is no provision in the text of either the Project 70 Act or the DDPA which indicates that the General Assembly intended either law to have preeminence over the other in situations such as that presented by the case at bar — *i.e.*, where land which has been acquired by a municipality using Project 70 Act funds to pay one half of the cost of acquisition is then committed to public use by that municipality, improved by the municipality using other public monies, and devoted to continuous public use. Indeed, neither statute speaks directly to this situation. Further, contrary to the findings of the Commonwealth Court and the assertions of the Borough and Developers, the 1999 and 2012 legislative enactments do not, by their explicit terms, confer a general authorization on the Borough to sell the Northern Parcels to Developers. These enactments merely removed Project 70 Act restrictions from these parcels, but the legislation contains no language exempting the Borough from complying with the requirements of the DDPA.[42] Consequently, these enactments do not control the resolution of this issue.

Therefore, consistent with our overarching goal of construing statutes to fulfill the intent of the General Assembly, we are obliged to construe the Project 70 Act and the DDPA in harmony, if possible, so as to give effect to both.[43] *See, e.g., Commonwealth*

---

[42] *See* Act of June 25, 1999, P.L. 220, No. 29 §§ 1, 2 (specifying that the legislation was enacted "[u]nder the requirements of [Section 3946.20]" of the Project 70 Act, and that the land was "to be released from Project 70 restrictions."); Act of Oct. 24, 2012, P.L. 1293, No. 162, § 6(a) (providing that the legislation was enacted "[p]ursuant to the requirements of [Section 3946.20]" and that "the General Assembly hereby approves the release of Project 70 restrictions."). As noted previously, *see supra* note 23 and accompanying text, the General Assembly did not entirely remove Project 70 Act restrictions from Northern Parcel UPI 40-1-23.1

[43] Because our grant of *allocatur* did not encompass this issue, we need not consider the Commonwealth Court's finding in *Downingtown II* that the Objectors had standing to pursue their claims under the DDPA to be dispositive of this question, as it is seemingly in tension with that tribunal's ultimate holding that the DDPA does not govern the Borough's right to sell the Northern Parcels.

*v. Hansley,* 47 A.3d 1180, 1189 (Pa. 2012) (construing separate statutes, the Recidivism Risk Reduction Act and the mandatory minimum sentencing provisions of the Crimes Code, in accordance with their plain language and in a manner which gives effect to both statutes); *see generally* Sutherland, *Statutory Construction* § 53:1 (7th ed.) (observing that courts have a duty to construe statutes harmoniously where it is reasonable to do so); 73 Am. Jur. 2d Statutes § 159 ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed legislative intention to the contrary, to regard each as effective."). This is in accord with the directives of the SCA, which provides that "[s]tatutes or parts of statutes are in *pari materia* when they relate to the same persons or things or to the same class of persons or things," and which mandates that "[s]tatutes in *pari materia* shall be construed together, if possible, as one statute." 1 Pa.C.S. § 1932(a), (b); *City of Philadelphia*, 132 A.3d at 953; *see also Kelly v. City of Philadelphia,* 115 A.2d 238, 245 (Pa. 1955) ("[S]tatutes in *pari materia* should be considered concurrently whenever possible and if they can be made to stand together effect should be given to both as far as possible."). It is only when the provisions of two statutory enactments are irreconcilable that it is necessary to resort to other statutory construction principles, such as the more specific statute governs the general one. *See* 1 Pa.C.S. § 1933 (when general provision in statute "conflict[s] with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is  irreconcilable, the special provisions shall prevail").

In the case at bar, the relevant provisions of Project 70 Act and the DDPA relate to the same class of things — the disposition of governmentally owned lands used by the public for recreation. Considering both the coextensive scope of the Project 70 Act and the DDPA regarding the rights and duties of political subdivisions to dispose of

lands utilized for those purposes, and the distinct, but equally important public interests both of these enactments are intended to further, we conclude they must be read in *pari materia*. Therefore, we must strive to give effect to the provisions of both statutes.

Under the Project 70 Act, whenever Project 70 Act monies are granted to a municipality for the purposes of acquiring lands for "recreation, conservation and historical purposes," the deed conveying the property must contain an indenture, i.e., a restrictive covenant specifying that the land is being acquired "for recreation, conservation and historical purposes as said purposes are defined in [the Project 70 Act." 72 P.S. § 3946.20(c). This restrictive covenant between the local government body and the General Assembly is intended to protect the public *fisc* by insuring that monies which were borrowed by the Commonwealth, as authorized by the Project 70 Act, and granted to municipalities will only be used in strict accord with the public purposes designated by that act. That the paramount purpose of this provision is to safeguard the Commonwealth's funds is further evidenced by the significant penalties the Project 70 Act imposes on a municipality which violates the act by using the property in a manner inconsistent with the public purpose for which it was acquired, such as conveying it to a private party. If such a violation occurs, the municipality is obliged to return to the Commonwealth the full amount of the Project 70 Act monies advanced to it, plus a statutory rate of interest of six percent from the date the monies were granted. *Id.* § 3946.20(d).

By contrast with the Project 70 Act, as our Court recognized in *Erie Golf Course*, the fundamental purpose of the DDPA is to delineate "the fiduciary nature of municipalities' obligations relative to donated and dedicated properties and provided for orderly relief therefrom in appropriate circumstances." 992 A.2d at 86. We further discerned that, in enacting the DDPA, the General Assembly incorporated "salient

common-law principles" of the "public trust doctrine" as articulated in our caselaw prior to its enactment. *Id.* Under that doctrine, whenever property was dedicated to public use by a municipality, this action created a trust for the property with the public as the beneficiary. It correspondingly required the municipality to act in the capacity of a trustee by holding the property in favor of the community, and restricted the municipality from diverting it from public use, or conveying it to a private party. *Board of Trustees of Philadelphia Museums, v. Trustees of University of Pennsylvania*, 96 A. 123, 125 (Pa. 1915); *In re Petition of Acchione*, 227 A.2d 816, 820 (Pa. 1967) (once land is dedicated to a public use by a municipality, the municipality becomes "trustee, subject to all the duties and responsibilities imposed on any other trustee."). As we recounted in *Philadelphia Museums*, the public trust doctrine was developed in order to protect the significant interests the public acquires in such property through their use of it and the expenditures of tax monies for its care and improvement. 96 A. at 125.

Section 3382 of the DDPA codifies these legal precepts by providing:

> All lands or buildings heretofore or hereafter donated to a political subdivision for use as a public facility, or dedicated to the public use or offered for dedication to such use, where no formal record appears as to acceptance by the political division, as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.

53 P.S. § 3382.

Although the DDPA does not expressly define what constitutes a "dedication" of property to public use — triggering the requirement of orphans' court approval for its disposition — we noted in *Erie Golf Course* that, under our prior decisions involving the common law public trust doctrine, a property is "dedicated" to public use by a

municipality whenever the municipality has both committed the property to public use *and* the public has accepted it for such use. 992 A.2d at 85 n.14; *Philadelphia Museums*, 96 A. at 125; *see also Appeal of Leech*, 89 A.2d 351, 353 (Pa. 1952) ("A municipality's dedication to a public use of land which it owns in fee must be accepted by the public in order to become binding on the municipality."). Consequently, the DDPA is facially applicable to all property which meets these criteria. *Erie Golf Course*, 992 A.2d at 85 n.14.

Importantly, as related above, our Court held in *Erie Golf Course* that property which was initially acquired via purchase by the local government was not excluded from the ambit of the DDPA by Section 3386, which facially excludes purchased property. In fact, we expressly recognized that "purchased property can be committed to the public trust." *Id.* at 88. Thus, it is the dedication of property to a public use as a public facility, not the stated purpose for its acquisition by the municipality at the time the acquisition takes place, which is the pivotal factor which brings the property within the protective ambit of the DDPA. *See* 53 P.S. § 3381 (defining "lands" as "all real estate, whether improved or unimproved," and "public facility" as "without limitation any park, theatre, open air theatre, square, museum, library, concert hall, recreation facility or other public use"); *id.* § 3382 (making a municipality the trustee of lands or buildings "*dedicated* to the public use . . . as a public facility" (emphasis added)). A dedication occurs for purposes of the DDPA only when, after a property is acquired, a municipality thereafter commits it to a public use as a public facility, *and* the public accepts that use. For this reason, we reject the argument of the Borough and Developers that the imposition of a Project 70 Act restrictive covenant, in and of itself, constitutes a "dedication" of that property within the meaning of the DDPA.

Contrary to the assertion of the Borough and Developers, this natural construction of the DDPA in accordance with its terms does not result in the DDPA applying to all lands that a municipality purchases. For instance, lands the municipality purchases with the intention to put to public use as public facilities, but which are not, subsequently, committed to that public use by the municipality, have not been dedicated, so the protective provisions of the DDPA are not triggered. Likewise, even if a municipality commits lands which it purchases to public use, they may not be accepted by the public for that use, and, again, there is no dedication of such property which implicates the DDPA.

To adopt the Borough and Developers' suggested contrary construction — that legislative release of Project Act 70 restrictions on property which is dedicated as a public facility, in and of itself, authorizes a municipality's sale of such facilities to private developers — would disregard the substantial public interests of the residents of a municipality who have paid, through their local tax dollars, fifty percent of the cost of acquisition of the property, and expended additional amounts of their tax dollars to maintain and develop the property so that they could use it as a public facility. Denying a municipality's residents the judicial remedy afforded them under the DDPA would impermissibly favor private interests over the public interest, and thus, we are compelled to reject such a construction. 1 Pa.C.S. § 1921(5). We therefore hold that the DDPA covers all property purchased by a municipality which has been dedicated to the public use as a public facility, and necessarily includes property which is purchased by the municipality, in part, with Project 70 Act funds, and thereafter dedicated to public use as a public facility.

Accordingly, the requirements of the Project 70 Act and the DDPA do not come into irreconcilable conflict, as the Commonwealth Court concluded, whenever a

municipality seeks to sell property acquired in part with Project 70 Act funds, and which is thereafter dedicated to public use as a public facility. Rather, the requirements of both enactments can and, indeed, must be met by the municipality. A municipality that purchases property with Project 70 Act monies, which is thereafter dedicated to a public use as a public facility, must, in order to convey that property, seek the General Assembly's release of the Project 70 Act restrictions imposed in the deed of acquisition, and must also seek orphans' court approval under the DDPA for the conveyance. This effectuates the legislative purpose undergirding both enactments since it ensures that the General Assembly's interest in safeguarding the expenditure of Commonwealth funds will be secured when it authorizes the release of Project 70 Act restrictions, as well as protects, through orphans' court review, the discrete but related substantial interests the public has acquired in such property through the expenditure of their tax dollars to maintain and improve it, and through their use and enjoyment of the property. The DDPA, thus, ensures that public facilities are not sold precipitously, or for purposes that do not serve a true public benefit.

Applying these principles in the case before us, we conclude that the Borough was required to obtain orphans' court approval under the DDPA before selling the Northern Parcels, despite their release by the legislature from some of the Project 70 Act restrictions. The Northern Parcels are an integral part of Kardon Park, comprising slightly over half of its total area. As the orphans' court found in its first opinion, and which finding is amply supported by the record, the Borough committed this land, along with the other three parcels which are the subject of this litigation, to public use as a park, expressly via ceremony, and via its actions of expending public monies over the course of two decades to maintain this land for public use and to make permanent improvements thereon. Likewise, the orphans' court's finding that the public accepted

this land for this use as a park is equally well supported by the evidence of record. As highlighted by the orphans' court, and recounted previously in this opinion, this evidence shows that the public has made and continues to make extensive use of the entire park property, which includes these parcels, for a wide panoply of recreational activities.[44] Thus, the orphans' court's ultimate conclusion that the Northern Parcels have been dedicated to use as a public facility is supported by the record, and its approval is, therefore, required for their sale under Section 3384 of the DDPA. Consequently, we reverse the Commonwealth Court's order regarding the Northern Parcels and remand this case to that court for further proceedings consistent with this opinion.

### 2. Easements and the DDPA

We now address the Objectors' contention that the Borough was required to obtain orphans' court approval under the DDPA to grant to Developers easements conferring on them the right to discharge stormwater into the two ponds on the Meisel Parcel (Second and Third Lakes) and the pond on Northern Parcel UPI 40-1-23.1 (Fourth Lake), the right to construct and maintain utilities over these easements, and the right to use these easements to construct and maintain improvements to the park property required by the Borough's grant of conditional use approval for the proposed development.

In their brief, Kim and Stewart argue that these easements, although purportedly temporary in nature during construction, will be in effect even after the construction process is complete, and that they would transform the manner in which the remaining parkland will be experienced by its users and will effectively subjugate these public

---

[44] We do not mean to suggest that these evidentiary factors relied upon by the orphans' court in this instance are, as a matter of law, the necessary and exclusive ways by which commitment to a public use and acceptance may be demonstrated.

interests to those of the private developer. Specifically, Kim and Stewart note that the installation of a protective wetland barrier between the development and the lakes would reduce park users' access, and that the relocation of the walking trails would result in users gazing upon a gaggle of buildings rather than meadows and trees. Moreover, Kim and Stewart point out, these easements would ultimately be acquired by the homeowners association ("HOA") managing the development and would be enforceable by it. Thus, according to Kim and Stewart, this raises the prospect of a future conflict between the HOA and the public over the use of the remaining parkland, with the HOA objecting to future park improvements on the basis that they interfere with its private easement rights.

Kim and Stewart also emphasize that the Commonwealth Court previously determined that it is the nature of the intrusion onto park property, rather than the degree of the intrusion, which is the dispositive factor as to whether a municipality may permit any portion of parkland to be used for other purposes; hence, to be allowable, any proposed use must fit within the scope of the park's fundamental purposes. *See* Kim and Stewart Brief at 58 (citing*, e.g.*, *White v. Township of Upper Saint Clair*, 799 A.2d 188 (Pa. Cmwlth. 2002) (county was required to obtain orphans' court approval pursuant to the DDPA to grant a lease for the erecting of a cell phone tower on a small part of a 200-acre park that it owned, since it was obligated to insure that all of the parkland was used for a recreational, conservation or historical purpose).

Kim and Stewart offer that, in the present case, the Commonwealth Court had previously acknowledged in its 2013 opinion, *In re Council of Borough of Downingtown*, *see supra* note 22, that these easements would constitute an alienation of portions of the park and, thus, orphans' court approval under the DDPA was needed for their conveyance. Yet, incongruously, the *en banc* Commonwealth Court in *Downingtown II*

apparently disregarded that conclusion, finding that the DDPA does *not* apply. Endorsing Judge McCullough's dissent in *Downingtown II*, *see supra* note 32, Kim and Stewart claim that this creates a new and dangerous precedent which contravenes the principle that public property should not be used for purely private purposes. In Kim and Stewart's view, this decision allows parkland to be used "to satisfy the private needs of developers and landowners." Kim and Stewart Brief at 62.

Friends largely press the same arguments as Kim and Stewart, but also stress that there is no dispute among the parties that the lands across which these easements have been granted are within the scope of the DDPA, and that, prior to *Downingtown II*, there was no question that *any* alienation of parkland required judicial approval under that act. While disputing the Commonwealth Court's conclusion that these easements would have minimal impact on the public's use of the park, Friends contend that the *effect* of the easements is of no legal relevance in considering whether the DDPA applies. Friends maintain that, under *Erie Golf Course*, there can be no alienation of such lands in any form to a private developer unless the orphans' court determines, pursuant to the DDPA, that it is not practical to continue their use as a public park.

The Borough and Developers respond that orphans' court approval was not required under the DDPA because it requires only that dedicated properties held in trust "be used for the purpose or purposes for which they were originally dedicated or donated." Borough and Developers Brief at 38 (quoting 53 P.S. § 3383). The Borough and Developers argue that the orphans' court correctly found, based on the record, that the easements would not impact the parcels' use for normal park purposes. The Borough and Developers contend that, because this finding was supported by competent evidence, the Commonwealth Court properly upheld it. As a result, the

Borough and Developers assert that it is irrelevant that the easements are being granted to a private party.

Upon review, we initially note that the Meisel Parcel, although acquired through donation, has been dedicated by the Borough, in its entirety, for use as a public park, and that it is, therefore, within the scope of the DDPA. Furthermore, we have already determined in our discussion of the previous issue in this appeal that Northern Parcel UPI 40-1-23.1, over which easements have also been granted by the Borough, remains subject to the DDPA, despite the General Assembly's release of the Project 70 Act restrictions on that parcel. Thus, under the DDPA, both of these parcels are deemed to be "held by [the Borough], as trustee," for the benefit of the public. 53 P.S. § 3383.

Section 3383 of the DDPA specifically restricts a municipality's use of such public trust property:

> All such lands and buildings held by a political subdivision as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order pursuant to this act.

*Id.* Following the SCA's command that, when interpreting statutory language, all "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," 1 Pa.C.S. § 1903(a), we interpret the use of the phrase "all lands" as prohibiting a municipality from approving use of *any* of the land held in public trust for a purpose other than the public purpose for which it was dedicated, absent judicial approval. In our view, the requirements of Section 3383 apply even though the property held in public trust which the municipality seeks to divert to non-public use amounts to but a small portion of the trust property. *See White*, *supra* (county was required to seek court approval for lease of .428 acres of 200-acre county park for placement of a cell phone tower). Section 3383's proscription, therefore, applies to the portions of the parcels which will be used for stormwater, utility, and

maintenance easements even though they do not occupy the entire area of the parcels. The central question, then, is whether the Borough's granting of the easements to the Developers constituted a diversion from "the purpose or purposes for which [the parcels] were originally dedicated," thus requiring judicial approval.

Section 3383's restriction of a municipality's power to unilaterally change the purpose for which property has been dedicated to the public trust is a codification of a bedrock tenet of the common law public trust doctrine, which is that "[a] municipality cannot revoke or destroy, after dedication and acceptance, the right of the public to the exclusive use of the property for the purpose designated." *City of Easton v. Koch*, 31 A.2d 747, 752 (Pa. Super. 1943). Consistent with this principle, the common law public trust doctrine strictly prohibits a governmental body from conveying public lands to an entity or person for private use. *See generally Payne v. Kassab*, 361 A.2d 263, 268 (Pa. 1976) (land dedicated in public trust may not be diverted by governmental officials to private use); *Philadelphia Museums*, 96 A. at 123-24 (the local government "holds, subject to the trusts, in favor of the community, and is but the conservator of the title in the soil, and has neither power nor authority to sell and convey the same for private purposes."). The DDPA retains this common law prohibition, but modifies it to afford a municipality the right to seek judicial approval for a fundamental change in the purpose for which public trust property has been used and dedicated.

It is plain to us that the conveyance of the challenged easements to Developers would allow them to use portions of the dedicated parcels subject to the easements for a *private* purpose — namely, to effectuate the construction and maintenance of a private housing development — which is distinct from the *public* purpose for which for that land was dedicated, as a park. Further, it is a well established legal principle that an easement is "an interest in land owned by another person, consisting in the right to

use *or control* the land, or an area above or below it, for a specific limited purpose." *Stanton v. Lackawanna Energy, Ltd.,* 886 A.2d 667, 678 n.7 (Pa. 2005). Thus, as the easements would confer on Developers the right to control and use the portions of the parkland subject to the easements, the Borough has ceded to a private party some of the Borough's exclusive rights as trustee of that land to manage it for the public's benefit, thereby subordinating those public rights to the private rights of the easement holders. For these reasons, we conclude that the Borough was required to seek judicial approval from the orphans' court under Section 3384 in order to grant the easements in question. We, therefore, reverse the order of the Commonwealth Court on this question, and remand this matter to it for further proceedings consistent with this opinion.

### III. Conclusion

Order of the Commonwealth Court with respect to the disposition of the Southern Parcels is hereby vacated. Orders of the Commonwealth Court regarding the Northern Parcels and the easements across the Meisel Parcel and Northern Parcel UPI 40-1-23.1 are hereby reversed. This case is remanded to the Commonwealth Court for further proceedings in accordance with this Opinion. Jurisdiction is relinquished.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty, Wecht and Mundy join the opinion.